IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>WILLIE E. BRIGGS,<br><br>Defendant. | CR. NO. 21-00033 JAO<br><br>**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE** |

**ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

Before the Court is Defendant Willie E. Briggs' ("Briggs") Motion to Suppress Evidence, ECF No. 50, ("Motion"). After considering the parties' briefs and argument and incorporating its May 28, 2021 oral findings and conclusions rendered at the end of the hearing,[1] the Court DENIES the Motion for the following reasons.

## BACKGROUND

**A.    Factual Background**

During an investigation into a drug trafficking group in the Honolulu area, Federal Bureau of Investigation ("FBI") Special Agent Alexandre Silva ("the

---

[1]  In the event anything in this Order contradicts the Court's oral findings and conclusions, this Order controls.

affiant") swore to an affidavit on March 12, 2020 in support of a search of Briggs' residence ("Affidavit"). ECF No. 50-4 at 3–28. The Affidavit includes the following information.

On January 13, 2020, law enforcement conducted two undercover drug purchases using a confidential source ("CS"). ECF No. 50-4 ¶ 29. The CS initially called Darrin Young ("Young") to buy four ounces of methamphetamine and to introduce Young to his "friend" who was, in fact, an undercover officer ("UC"). ECF No. 50-4 ¶¶ 28–29. The CS, UC, and Young met at a Safeway parking lot at 4:21 p.m. that day, where the UC purchased four ounces of methamphetamine from Young. *Id.* ¶ 29. Prior to the transaction, law enforcement witnessed Christopher Benham ("Benham") get into the driver's seat of a Toyota at his own residence, pick up Young at Young's home, and drive to the Safeway parking lot, where he dropped Young off for the drug deal. *Id.*

During the transaction, the UC asked Young if he could purchase four additional ounces later that day. *Id.* ¶ 30. Young told the UC that he had to contact Benham to do so, and Young called Benham with the UC present. *Id.* Young told the UC that Benham needed time to get more drugs from his source, and that he would let the CS know when the methamphetamine was ready. *Id.*

Later that day, the UC contacted Young and scheduled the transaction for 7:30 p.m. at the same parking lot. *Id.* ¶ 31. Law enforcement again saw Benham

get into the same Toyota at his residence, pick up Young at his home, and drop Young off at the same Safeway parking lot before the transaction. *Id*. The UC purchased four ounces of methamphetamine from Young. *Id*. Young told the UC that the source of Benham's supply preferred to "break down" his methamphetamine when his family was not at home. *Id*. After the deal, officers saw Benham pick up Young. *Id*. Telephone records for Benham's phone from January 13, 2020 revealed multiple communications between Young and Benham, and between Benham and a phone number identified as belonging to Briggs. *Id*. ¶ 33.

On January 21, 2020, the UC contacted Young to arrange for the purchase of eight ounces of methamphetamine. *Id*. ¶ 34. Young agreed to sell the drugs and scheduled the meeting for the following day. *Id*. On January 22, 2020, the CS called Young to ask about the timing of the deal, and Young informed the CS that Benham still had to obtain the drugs. *Id*. That afternoon, the UC and CS met Young at the same parking lot and purchased eight ounces of methamphetamine. *Id*. Prior to this transaction, law enforcement witnessed the same pattern: Benham entered the same car at his residence, drove to pick Young up at his home, and dropped Young off in the Safeway parking lot. *Id*. Telephone records for Benham's phone for January 22, 2020 again showed contacts between Young and Benham, and between Benham and Briggs, prior to the transactions. *Id*. ¶ 35.

On February 4, 2020, the CS arranged with Young to purchase eight ounces of methamphetamine two days later. *Id.* ¶ 36. On February 6, 2020, the CS called Young to ask if he could "double up," his order, which would amount to a pound of methamphetamine. *Id.* Young said that he had to check with Benham. *Id.* Later that day, law enforcement saw Benham get into a rental sedan at his residence carrying a black backpack, pick up Young, and drive to the same parking lot and drop off Young. *Id.* Young met with the UC and CS, and sold them eight ounces of methamphetamine, but they had a disagreement about the price. *Id.* The UC told Young to call Benham to clarify the purchase price and witnessed Young make a call to discuss the price. *Id.*

On March 11, 2020, the CS and Young arranged for the purchase of one pound of methamphetamine on March 12, 2020 at 10:00 a.m. *Id.* ¶ 38. At around 6:25 p.m. on March 11, Young called the CS and informed the CS of the time, location, quantity, and price of the methamphetamine to be sold. *Id.* Less than two hours later, at 8:15 p.m., law enforcement saw Benham leave his residence and drive to Briggs' building. *Id.* Telephone records revealed that Benham called Briggs for nearly two-and-a-half minutes at about 8:25 p.m. while en route. *Id.* At 8:36 p.m., Benham called Briggs again, and this call lasted only 32 seconds. *Id.* According to the Affidavit, this timeframe "is consistent with when Benham arrived at [Briggs'] [r]esidence." *Id.* (some capitalization omitted). Law

enforcement then saw Benham outside his vehicle in the parking garage of Briggs'

residence, meeting with a black male. *Id*. Briggs is a black male. *Id*. ¶ 41.

Surveillance watched as Benham left Briggs' building and parked in the vicinity of

Young's home. *Id*. ¶ 38.

On the morning of March 12, 2020, FBI agents arrested Benham as he left

his home right before the scheduled transaction. *Id*. ¶ 39. Agents searched a

laptop case he carried, and found drug paraphernalia, including scales, baggies,

syringes, and small amounts of methamphetamine and cocaine. *Id*. Agents also

searched Benham's apartment, but did not find the pound of methamphetamine.

*Id*. However, they did find a paystub for Briggs, bearing Briggs' address, in

Benham's room. *Id*. During the search, a resident of Benham's residence who

identified herself as Benham's girlfriend[2] "stated in substance that Benham had left

earlier to pick up Young, then intended to drive to meet Briggs to pick up the

methamphetamine for the transaction." *Id*. ¶ 40 (some capitalization omitted).

**B.      Procedural Background**

On March 17, 2021, the Grand Jury returned an Indictment charging Briggs

with one count of conspiracy to distribute and possess with intent to distribute

methamphetamine, in violation of 21 U.S.C. § 846; one count of possession with

intent to distribute 50 grams or more of methamphetamine, in violation of 21

---

[2]  The parties identify Benham's girlfriend as Lianne Nakaji. *See* ECF No. 50-9.

U.S.C. §§ 841(a)(1) and 841(b)(1)(A); one count of possession with intent to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); and one count of possession with intent to distribute cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C).  ECF No. 41.

Briggs filed the Motion on April 1, 2021.[3]  ECF No. 50.  The Government filed a Memorandum in Opposition on May 7, 2021.  ECF No. 55.  Briggs filed a reply within a week.  ECF No. 56.  The Court heard oral argument on May 28, 2021.  ECF No. 62.

## DISCUSSION

Briggs contends that the evidence found during a March 12, 2020 search of his residence must be suppressed because the Government falsified the Affidavit in support of the search warrant through four omissions and three misstatements of fact.  ECF No. 50-2.

---

[3]  Briggs was originally arrested pursuant to a Criminal Complaint, ECF No. 2, and filed a Motion to Suppress Evidence before an Indictment was returned, ECF No. 34.  Defense counsel orally withdrew that motion at a status conference on February 5, 2021, ECF No. 39, and filed a Notice of Withdrawal of the motion on the same day, ECF No. 40.

## A. Alleged Omissions

### 1. First Omission[4]: Two December 2019 Drug Deals

Briggs alleges that the Government deceived the magistrate judge by omitting from the Affidavit two drug deals that the CS arranged with Benham and Young in December 2019, in which Briggs was not involved. ECF No. 50-2 at 2–3. Briggs contends that the December 2019 deals were omitted because the Government first became aware of Benham's contact with Briggs in January 2020, and the Government sought to disguise Briggs' lack of connection with Benham's or Young's criminal behavior. *Id.* at 3.

### 2. Second Omission: Mailing Address Information, Young's Statement, and Benham's Arrest

Defendant next attacks the omission of certain other details from the Affidavit. Specifically, during one of the December 2019 deals, Benham delivered methamphetamine to the CS in a package that had Benham's mailing address on it, and other indications that the package had arrived from outside the United States.[5] *Id.* at 3. Further, at Young's detention hearing on March 12, 2020, he

---

[4] The Court adopts Briggs' nomenclature for each of the alleged omissions and misstatements.

[5] Defendant's Memorandum in Support of the Motion states that Benham delivered these packages to the CS in December 2020, *see* ECF No. 50-2 at 3, but Exhibit A, ECF No. 50-3, to which Defendant cites as support for this statement, indicates that the deal took place in December 2019.

spontaneously uttered that Benham was the source of his methamphetamine, and the Affidavit failed to mention Benham's arrest.  *Id.*

### 3.    Third Omission:  Nakaji's Statement about Briggs' Paystub

Briggs also contends that Nakaji explained the reason Briggs' paystub was at Benham's residence was because she prepared Briggs' taxes, and that this would have offered an innocent explanation for its presence.  ECF No. 50-2 at 4.

### 4.    Fourth Omission:  Benham's Meeting with Two Unknown Males and the Government's Loss of Surveillance

Briggs alleges that the Government omitted from the Affidavit Benham's meetings with two unknown men on March 11, 2020, and that officers lost surveillance of Benham for over an hour that day.  *Id.*  Around 2:20 p.m. on March 11, 2020, Benham retrieved a black bag from his trunk that he used to transfer methamphetamine in prior drug exchanges and met with an unknown male in his car.  *Id.*  From 3:35 p.m. to 4:49 p.m., the officers lost visual contact with Benham. *Id.* at 5.  At 5:17 p.m., Benham returned to his residence with his black bag and met another unknown male for an hour and thirty-three minutes.  *Id.*  Then, Benham arrived at Briggs' residence.  *Id.*  When he met with Briggs around 8:50 p.m., none of the surveillance officers saw him with a black bag nor saw anything exchanged between the two men.  *Id.*  Around 9:40 p.m., Benham arrived at Young's residence.  *Id.*  Surveillance was terminated at that time, and no physical or electronic surveillance of Benham or Young was collected until the next day

when they were arrested. *Id.* Briggs alleges that the inclusion of this information would have "eliminated any plausible claim of a nexus" between Briggs' residence and Benham's drug dealing. *Id.* at 6.

## B. Alleged Misstatements of Fact

### 1. First Misstatement: Nakaji's Statement

Briggs alleges that the Government intentionally overstated Nakaji's statement to law enforcement that, "in substance . . . Benham had left earlier to pick up Young, then intended to drive to meet Briggs to pick up the methamphetamine for the transaction." ECF No. 50-2 at 6 (quoting ECF No. 50-4 ¶ 40) (some capitalization omitted). In fact, an FBI report of Nakaji's interview indicates, "[a]t the time of his arrest, Benham was leaving the residence to go meet Young," and that the two were "possibly" going to Briggs' residence at the time of Benham's arrest. ECF No. 50-9.

### 2. Second Misstatement: March 11, 2020 Meeting with Briggs

Briggs argues that the Government inferred that Benham met with Briggs to receive one pound of methamphetamine for Young's March 12, 2020 drug deal based on two telephone calls Benham made to Briggs on March 11, 2020. ECF No. 50-2 at 8–9. The Affidavit states that Benham called Briggs on March 11, 2020 at 8:25 p.m. and then again at 8:36 p.m., consistent with the time Benham arrived at Briggs' residence. *Id.* However, HPD records indicate that Benham met

with a black male in the parking lot of Briggs' building at 8:50 p.m.  *Id.*  And the

Government did not recover the one pound of methamphetamine from Briggs'

residence; rather, it was recovered from Young's residence on March 12, 2020.  *Id.*

### 3.    Third Misstatement:  Relationship between Briggs and Benham

Finally, Briggs alleges that the Government misstated that Briggs was

Benham's drug supplier based on three phone calls made on January 13, 2020,

January 22, 2020, and March 11, 2020.  *Id.* at 9.  On these dates, as well as three

additional dates, the Government observed Benham and Young engage in drug

dealing activity.  *Id.*  Briggs alleges that his relationship with Benham was through

Briggs' cleaning business, and Benham performed menial tasks for Briggs,

including walking Briggs' dogs.  *Id.*

### C.    *Franks* Analysis

Although Briggs does not cite it in the Motion, the question before the Court

is whether the fruits of the search should be suppressed pursuant to *Franks v.*

*Delaware*, 438 U.S. 154 (1978).  In *Franks*, the Supreme Court explained that the

"bulwark of Fourth Amendment protection" is the Warrant Clause, which requires

that "absent certain exceptions, police obtain a warrant from a neutral and

disinterested magistrate before embarking upon a search."  *Id.* at 164.  Such

protection requires a warrant affidavit to contain a "truthful" showing that is

"believed or appropriately accepted by the affiant as true," allowing the magistrate

to independently evaluate the matter. *Id.* at 165. A defendant alleging that an affidavit contained false statements or omissions may challenge the affidavit's veracity at a *Franks* hearing, which is "an evidentiary hearing on the validity of the affidavit underlying a search warrant." *United States v. Reeves*, 210 F.3d 1041, 1044 (9th Cir. 2000) (citation omitted).

To obtain a *Franks* hearing, a defendant "must make a substantial preliminary showing that: (1) the affiant officer intentionally or recklessly made false or misleading statements or omissions in support of the warrant, and (2) the false or misleading statement or omission was material, *i.e.*, necessary to finding probable cause." *United States v. Norris*, 942 F.3d 902, 909–10 (9th Cir. 2019) (internal quotation marks and citation omitted). The focal question, then, "is whether probable cause remains once any misrepresentations are corrected and any omissions are supplemented." *Id*. at 910 (citation omitted). If it does not, at the subsequent evidentiary hearing, a defendant must establish both prongs of the *Franks* inquiry by a preponderance of the evidence. *See id.* If the defendant meets this burden, "the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit." *Franks*, 438 U.S. at 156.

"Probable cause to search a location exists if, based on the totality of the circumstances, a 'fair probability' exists that the police will find evidence of a

crime." *Norris*, 942 F.3d at 910 (citing *Perkins*, 850 F.3d at 1119). "[I]n doubtful cases, preference should be given to the validity of the warrant." *United States v. Burnes*, 816 F.2d 1354, 1357 (9th Cir. 1987) (internal quotation marks and citation omitted).

### 1.    Substantial Preliminary Showing

In order to make a substantial preliminary showing of intentional or reckless misrepresentation and materiality, a defendant must make an offer of proof of such misrepresentation. *See Franks*, 438 U.S. at 171. An alleged misrepresentation evinces a reckless disregard for the truth where an affiant had "a high degree of awareness of [a statement's] probable falsity." *United States v. Senchenko*, 133 F.3d 1153, 1158 (9th Cir. 1998) (internal quotation marks omitted).

The Ninth Circuit has outlined some contours of what constitutes a substantial preliminary showing that an officer intentionally or recklessly made false or misleading statements or omissions in support of a warrant. For example, in *United States v. Ruiz*, 758 F.3d 1144, 1149 (9th Cir. 2014), the Ninth Circuit affirmed the district court's finding that omissions were reckless where the omitted information detailed important problems with a witness' credibility. In *United States v. Perkins*, 850 F.3d 1109 (9th Cir. 2017), the court reversed the district court's findings and determined that an agent's numerous omissions — including that certain child pornography charges against the defendant in a related

investigation were dismissed because the images were not deemed pornographic — "reveal[ed] a clear, intentional pattern" of "selectively includ[ing] information bolstering probable cause, while omitting information that did not," *id.* at 1117, and amounted to "at least a reckless disregard for whether the omissions would render the warrant application misleading." *See id.* at 1117–18. In *United States v. Stanert*, 762 F.2d 775 (9th Cir. 1985), the court similarly reversed the district court and held that several misstatements and omissions in an agent's affidavit were at least recklessly made, including: (1) a suggestion that an anonymous source of information reported that the occupants of a home were using ether to free-base cocaine or manufacture drugs when, in fact, the source did not suggest that the defendant was operating a drug laboratory and was speculating about the cocaine use, *see id.* at 780; (2) an omission that a suspect's arrest did not result in a conviction, *see id.* at 781; and (3) an omission that an explosion at the site of the search occurred *before* the suspect lived there, *see id.* Similarly, in *Burnes*, 816 F.2d at 1357–58, the Ninth Circuit determined that an agent's characterization that law enforcement observed "numerous vehicles" make short stops of no more than twenty minutes at the search site was deliberate or reckless because, of thirteen vehicles that stopped there, only four of them remained for twenty minutes or less. And in *United States v. Martinez-Garcia*, 397 F.3d 1205, 1216 (9th Cir. 2005), the court found an agent "knowingly omitted" from an affidavit information that an

informant had pending federal drug charges for which law enforcement had agreed to provide a favorable recommendation to prosecutors.

With these contours in mind, the Court turns to the evaluation of each of the alleged omissions and misstatements.

### a. Briggs has failed to make a substantial showing that the First Omission was recklessly or intentionally misleading.

The omission from the Affidavit of the two drug deals that took place in December 2019 between the CS, Benham, and Young, was not misleading. There was no evidence presented that the affiant was affirmatively aware that Briggs was not involved in those deals. In any event, the Government persuasively argued at the hearing that, even if, at that early stage of the investigation, the Government was in fact aware that Briggs was not involved, Benham could have had different sources of supply at different times. The Court finds that the affiant's omission of these two deals — which took place months before the search warrant affidavit was signed — was neither reckless nor intentional, and certainly not similar to the omissions and misstatements outlined in the caselaw mentioned above.

### b. Briggs has not made a substantial preliminary showing that the Second Omission was recklessly or intentionally misleading.

The Court also finds that the omission about the mailing address information on a box that Benham used to deliver drugs in December 2019 was neither intentionally nor recklessly misleading. Again, the import of the December 2019

deals to the investigation into Briggs was minimal, and it would not matter in any event if Benham had a different source of supply months earlier.

Similarly, the fact that Young spontaneously uttered that Benham was the source of his methamphetamine and that Benham was arrested are consistent with the facts laid out in the Affidavit. The Affidavit made clear Young obtained the methamphetamine for the deals directly from Benham, who dropped him off for each of the deals and was not present for them. And Benham's arrest did not negate Briggs' alleged involvement.

> **c.      Briggs has failed to make a substantial showing that the Third Omission was recklessly or intentionally made to mislead the Magistrate Judge.**

Nakaji's explanation that Briggs' paystub was in Benham's home because she prepared Briggs' taxes might have offered an innocent explanation for why it was there. But nothing in the Affidavit suggests that there was a nefarious reason for its presence. Rather, the paystub only showed that Briggs and Benham were at the very least associates; that Benham's girlfriend prepared his taxes would have only furthered that suggestion. The Court therefore finds that the omission of Nakaji's statement about the paystub was neither recklessly nor intentionally made.

> **d.      Briggs has substantially shown that the Fourth Omission was recklessly omitted from the Affidavit.**

The Court finds that Briggs has made a substantial preliminary showing that the omission of details regarding the surveillance of Benham was reckless. It is

undisputed that the timeline of events regarding the surveillance of Benham was as follows, much of which was not included in the Affidavit[6]:

| DATE | TIME | EVENT | INCLUDED/NOT INCLUDED IN AFFIDAVIT |
|---|---|---|---|
| 3/11/20 | 12:28[7] | CS contacts Young to arrange for purchase of one pound of methamphetamine on March 12 at 10:00 a.m. | Included |
| 3/11/20 | 2:20 p.m. | Benham meets with an unknown male in his car after retrieving a black "computer type" bag ("the black bag") from his trunk. | Not included |
| 3/11/20 | 3:35 p.m. to 4:49 p.m. | Police lose Benham during surveillance. | Not included |
| 3/11/20 | 5:17 p.m. | Benham returns to his residence and takes the black bag into his residence. | Not included |
| 3/11/20 | 6:25 p.m. | Young contacts the CS in a recorded call to confirm the time, location, quantity, and price of methamphetamine to be sold the following day. | Included |
| 3/11/20 | 6:50 p.m. | Benham meets with an unknown male at his residence. The unknown male uses a vehicle that was known to the Government as a car Benham used in prior drug deals. | Not included |

---

[6] Many of the details in the chart are derived from a surveillance report of Benham.  ECF No. 50-8.

[7] The Affidavit is silent as to whether this time was a.m. or p.m.  However, either comports with the provided timeline.

| 3/11/20 | 8:15 p.m. | Benham drives away from his residence with a female passenger, drops her off at Queens Hospital at 8:20 p.m., and drives away at 8:24 p.m. | Included |
|---|---|---|---|
| 3/11/20 | 8:25 p.m. | Benham calls Briggs while driving. | Included |
| 3/11/20 | 8:36 p.m. | Benham calls Briggs again. The Affidavit describes this call as "consistent with when Benham arrived at [Briggs'] [r]esidence." *See* ECF No. 50-4 ¶ 38 (some capitalization omitted). | Included |
| 3/11/21 | 8:50 p.m. | Benham is seen meeting with a black male at the same street address as Briggs' residence. | The detail of the meeting is included; the time of the meeting is not. |
| 3/11/21 | 8:54 p.m. | Benham leaves and drives to Young's residence. | Included, except for the time of Benham's departure. |
| 3/11/21 | 9:03 p.m. | Benham arrives at Young's residence and enters his unit. | Not included |
| 3/11/20 | 9:40 p.m. | Surveillance is terminated for the evening. | Not included |
| 3/12/20 | Immediately prior to scheduled deal (10:00 a.m.) | Benham is arrested. | Included |

The omissions from the timeline of surveillance are on par with the sort of omissions found to be reckless in caselaw. The failure to include Benham's two meetings with other unknown men is particularly problematic. In one instance, Benham met with a man in his car after he obtained a black "computer type" bag

from his trunk. *See* ECF No. 50-8 at 3. And in the other, someone arrived in a car Benham used in prior drug deals and entered Benham's apartment within two hours after Benham was seen returning to his apartment with the black bag. *See* ECF No. 50-8 at 4. Moreover, law enforcement knew that a black backpack had likely been used during at least one of the prior transactions. *See* ECF No. 50-4 ¶ 36. At best, the affiant was unaware of all these important details of the surveillance, which is no excuse where the details could have been easily obtained. *See*, *e.g.*, *United States v. Chesher*, 678 F.2d 1353, 1360–61 (9th Cir. 1982) (holding that a defendant made substantial preliminary showing of recklessness based, in part, on agent's description of defendant as a member of the Hells Angels, when defendant's expulsion from the group four years earlier was "quickly . . . available to investigative agents," because another officer had written a report of the expulsion shortly thereafter). At worst, the affiant cherry-picked surveillance details that served his probable cause without including those that did not. The Court therefore finds that Briggs has made a substantial and preliminary showing of recklessness regarding the Fourth Omission.

        **e.**     **Briggs has not substantially shown that the First Misstatement was reckless or intended to mislead the Magistrate Judge; even if it had been, correction of the First Misstatement would not have altered the probable cause analysis.**

The FBI report regarding Nakaji's statement includes the following:

NAKAJI resides at the apartment with CHRISTOPHER BENHAM[.]
NAKAJI and BENHAM share the bedroom at the end of the hallway
on the right. . . .  NAKAJI and BENHAM were previously romantic
but are now roommates.

NAKAJI worked with WILLIE BRIGGS[.]  NAKAJI, BENHAM and
BRIGGS all remained friends.  NAKAJI lived near BRIGGS and
walked his dogs.

. . . .

At the time of his arrest, BENHAM was leaving the residence
to go meet YOUNG.

NAKAJI acknowledged that BENHAM was dealing
methamphetamine along with YOUNG on a daily basis.

BENHAM and YOUNG go to BRIGGS' house and were
possibly going there at the time of BENHAM's arrest.

Questioned about BENHAM's activities on the previous night,
NAKAJI stated BENHAM took NAKAJI's niece to Queens
Hospital and then picked up NAKAJI from work at the cab
company.

When ask[ed] if BENHAM is a methamphetamine dealer
NAKAJI responded "Yes."

When asked if BRIGGS was BENHAM's methamphetamine
supplier NAKAJI responded "Yes."

ECF No. 50-9.

The Affidavit indicated that Nakaji "stated in substance that Benham had left

earlier to pick up Young, then intended to drive to meet Briggs to pick up the

methamphetamine for the transaction."  ECF No. 50-4 ¶ 40 (some capitalization

omitted).  The Court views this statement as a conclusory exaggeration of what

occurred during the interview, and deciding whether there was a substantial showing of recklessness here is a close call.  But when taking into consideration *all* of what Nakaji said, the Court finds that Briggs has not made a substantial showing of reckless or intentional disregard for the truth.  Nakaji reported that Benham was going to Young's, that Benham and Young were dealing methamphetamine *on a daily basis*, that the two were "possibly" headed to Briggs' home, and that *Briggs was Benham's supplier*.  In any event, if the Affidavit had been corrected to indicate what occurred during the interview, the difference would have nevertheless supported the probable cause finding.[8]

### f. Briggs has not made a substantial showing that the Second Misstatement was a misstatement.

Briggs alleges that the Affidavit included phone calls to infer that Benham met with Briggs to retrieve one pound of methamphetamine for Young's March 12, 2020 drug deal.  The Affidavit's only arguable misstatement on this topic is that the 8:36 p.m. call was "consistent with when Benham arrived at [Briggs'] [r]esidence," because officers did not witness Benham meeting with an African-American male until fourteen minutes later.  But Briggs has failed to make a

---

[8]  Moreover, Nakaji's credibility was demonstrated by her close relationship with Benham, her friendship with Briggs, and her sharing of details consistent with the surveillance of Benham the previous night.

substantial preliminary showing that this characterization was in fact a misstatement and, if so, that it was intentionally or recklessly made.

The surveillance report shows that, at 8:24 p.m., "Benham heads onto the H-1 east, takes the Punahou off ramp then eventually makes his way to [Briggs' apartment]." *See* ECF No. 50-8 at 4 (some capitalization omitted). Then, at 8:50 p.m., Benham gets out of his car and is seen meeting with an African-American male. *Id.* The report is otherwise silent as to what was observed between 8:24 p.m. and 8:36 p.m. There is no indication in the report, nor any proffer, to suggest that the 8:36 p.m. call was in fact inconsistent with Benham's arrival.

### g.   Briggs has not met his burden of substantially showing the Third Misstatement was reckless or intentional.

Defendant avers that the Government claims that Mr. Briggs "was the supplier for Benham's drug dealing because Benham called Mr. Briggs by cellular phone on January 13, 2020, January 22, 2020, and March 11, 2020. Those are three of six dates where the Government observed Benham and Young, not Mr. Briggs, engaging in drug dealing activity." ECF No. 50-2 at 9. Defendant further contends that "[i]t is unreasonable to the point of absurdity to assume that phone calls between parties (without the context of the conversations in those calls) would indicate a conspiracy to commit a crime." *Id.* While it would indeed be absurd to assume that phone calls between individuals alone evince a drug conspiracy, that is not what the affiant did. Rather, the Affidavit offered dates and

times of phone calls in conjunction with dates and times of suspected drug transactions.  Where inferences were explicitly drawn about those calls, such inferences were not unreasonable.  *See United States v. Chavez-Miranda*, 306 F.3d 973, 978 (9th Cir. 2002) ("Under the totality of the circumstances test, otherwise innocent behavior may be indicative of criminality when viewed in context." (citation omitted)).  The Court therefore finds that Briggs has not demonstrated that the recitation of the phone calls was a misstatement, nor one for which he has made a substantial preliminary showing of recklessness or intentionality.

2.     **Probable Cause Where the Misrepresentations Are Corrected and Omissions Included**

The Court now evaluates whether, had the Affidavit included the Fourth Omission, it supports a probable cause finding.  It is true that Benham met with other individuals on March 11, 2020, who could have supplied drugs to him.  But inclusion of those facts does not extinguish the probable cause outlined in the Affidavit.  The Affidavit outlined how, on the same day the deal was arranged for March 12, Benham later met in the parking lot of Briggs' residence with someone, the description of whom did not foreclose the person from being Briggs.  The Affidavit coupled this with the "substance" of what Nakaji told law enforcement — that Briggs was Benham's source of supply, that Benham and Young were dealing drugs daily, and that they were possibly headed to Briggs' home immediately prior to the scheduled one-pound transaction.  The timeline of the

phone calls as outlined in the Affidavit further buttresses the probable cause finding. Evaluating the totality of the circumstances here, there remains probable cause for the issuance of the search warrant, even with the inclusion of the omitted surveillance details. The Court therefore concludes that Briggs is not entitled to a *Franks* hearing.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court DENIES the Motion.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaiʻi, June 30, 2021.



Jill A. Otake
United States District Judge